**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL K. DESMOND, not individually, but as Chapter 7 Trustee for the Bankruptcy Estate of YELLOW CAB AFFILIATION, INC., <br><br>               Plaintiff, <br><br> v. <br><br> TAXI AFFILIATION SERVICES LLC; MICHAEL LEVINE; PATTON R. CORRIGAN; EVAN TESSLER; GARY SAKATA; JOHN MOBERG; YELLOW CAB ASSOCIATION INC. A/K/A YELLOW CAB ASSOCIATION CO.; YELLOW GROUP LLC; YELLOW MEDALLION HOLDINGS LLC; CL MEDALLION HOLDINGS LLC; TAXI MEDALLION MANAGEMENT LLC; PEOPLE MOVER LLC; and YELLOW CAB PARTNERS LLC, <br><br>               Defendants. | Case No. <br><br> JURY DEMANDED |

## COMPLAINT

Michael K. Desmond, not individually but solely in his capacity as Chapter 7 Trustee ("Trustee") of the bankruptcy estate of Yellow Cab Affiliation, Inc. ("YCA" or "Debtor"), by and through his attorneys, hereby complains against Taxi Affiliation Services LLC, Michael Levine, Patton R. Corrigan, Evan Tessler, Gary Sakata, John Moberg, Yellow Group LLC, Taxi Medallion Management LLC, Yellow Medallion Holdings LLC, CL Medallion Holdings LLC, People Mover LLC, and Yellow Cab Partners LLC (collectively, "Defendants"), as follows:

## INTRODUCTION

1.      The Defendants in this action damaged YCA and its creditors in at least three ways:

- ***First***, after becoming aware of a personal injury lawsuit brought by a passenger who suffered a traumatic brain injury while riding in a Yellow Cab, Defendants made YCA insolvent by stripping it of all its revenue and transferring that revenue to insiders.

- ***Second***, while YCA was insolvent, Defendants used money they took from YCA to acquire Chicago taxicab medallions that they eventually sold for $180 million, pocketing $160 million in profit without paying YCA a dime.

- ***Third***, the day after the Trustee was appointed, Defendants abruptly canceled essential services to YCA, forcing YCA out of business and allowing Defendants to steal YCA's members and appropriate a $15 million per year revenue stream without paying for it.

These actions resulted in funds that rightfully belonged to YCA being diverted to insiders and affiliates rather than being used to pay YCA's creditors.

## I.  Defendants Strip YCA of its Revenue to Avoid Creditors

2.     Since its incorporation in 1996 and until it ceased active operations in 2016, YCA was Chicago's largest taxicab affiliation, with over 1,600 dues-paying, medallion-holding members ("Members") and approximately 3,000 taxicabs, 5,000 drivers, and yearly revenues of approximately $15 million.

3.     City of Chicago ordinances required medallion owners to join a licensed taxi affiliation in order to operate their vehicles.

4.     YCA entered into affiliation agreements ("Affiliation Agreements") with its Members under which YCA agreed to provide certain services to its Members in exchange for weekly membership fees.

5.      Specifically, under the Affiliation Agreements, Members paid YCA weekly fees of approximately $195 in exchange for (a) insurance coverage of $350,000 per occurrence, (b) dispatch (i.e., answering telephone calls requesting cabs), (c) cashiering (i.e., operating cash drop-off locations for drivers), and (d) a license to use YCA's color scheme and its "Insignia."

2

6.      Since its formation, YCA was the only taxicab company in Chicago permitted to use the color yellow on vehicles of its Members. YCA's parent company, Yellow Group LLC, also registered a "wing" design with the U.S. Patent and Trademark Office, but YCA and its members exclusively used the yellow color, the name Yellow Cab Affiliation, Inc., and a circular design mark on taxicabs in Chicago for 20 years (from 1996 through 2016).



7.      YCA held itself out to consumers as the company operating the taxicabs. As such, injured customers often sued YCA. The name "Yellow Cab Affiliation, Inc." appeared on the side of the taxicabs (see image above), as well as the company website, social media, and other materials.

8.      On August 31, 2005, a YCA passenger and customer named Marc Jacobs suffered a traumatic brain injury while riding in a taxicab of a YCA Member. On September 15, 2005, Jacobs and his wife commenced a lawsuit seeking damages for their injuries. They asserted claims for negligence against the driver, the YCA Member (i.e., the medallion owner), and YCA.

9.      On August 23, 2006, aware of the enormous potential liability of the Jacobs lawsuit and other potential judgment creditors, defendants created Taxi Affiliation Services LLC ("TAS") in an effort to make YCA insolvent and judgment proof. Their goal was to remove all of YCA's revenue ($15 million per year) generated from its Members and distribute those funds to themselves and other companies they owned or controlled.

3

10.    The ostensible purpose of TAS was to provide services to YCA (i.e., the cashiering and dispatch services YCA agreed to provide Members under the Affiliation Agreements), but the foreseeable effect was to remove YCA's cash from the reach of judgment creditors like the Jacobses. Indeed, YCA had done just fine without TAS for 10 years. It was only after Defendants became aware of high liability exposure (in 2005) that they formed TAS (in 2006) to make YCA insolvent.

11.    The Affiliation Agreements required Members to pay fees to YCA, but, since its inception in 2006, TAS—not YCA—collected all the payments from YCA's Members, which payments were owed to YCA under the Affiliation Agreements.

12.    TAS and YCA were parties to a services agreement (the "Services Agreement") that required TAS to send written invoices to YCA describing services provided, but YCA was required to pay TAS only after YCA's receipt and approval of such invoices.

13.    But, TAS never provided a single invoice to YCA, and YCA's officers, directors, and owners (who were the same as TAS's) never demanded or approved one. Rather, TAS took 100% of the revenues paid by YCA's Members. The officers and directors of TAS and YCA then made after-the-fact accounting entries (sometimes years after-the-fact) to make it appear that YCA had "paid" TAS a reasonably equivalent value for its services. TAS then transferred significant portions of YCA's revenue to individual insider defendants—such as Levine, Corrigan, Moberg, Sakata, Tessler and others—as "management fees" or to affiliated companies such as Taxi Medallion Management LLC as "referral fees" or other vaguely described expenses. YCA did not receive reasonably equivalent value in exchange.

4

14.     YCA remained insolvent during this entire period (from 2006 to 2016) with insufficient insurance coverage (only $350,000 per occurrence), despite thousands of its Members operating taxicabs at all hours and multiple lawsuits pending against YCA, including the Jacobs lawsuit.

15.     YCA has not paid one dime to any creditors, other than business-vendor insiders like its affiliate TAS, for over 10 years, during which time its millions of dollars in yearly revenues lined the pockets of its managers and owners.

**II.     YCA's Officers and Directors Pocketed $160 Million While YCA Was Insolvent.**

16.     Using revenue generated by YCA, entities owned, controlled, and/or managed by YCA's officers and directors (Levine and Corrigan) also acquired Chicago taxicab medallions.

17.     Levine and Corrigan purchased 542 medallions at an average purchase price of approximately $45,000 per medallion.

18.     The 542 medallions were also used as collateral for loans to entities owned and controlled by Levine and Corrigan.

19.     From 2012 to 2014, while they were officers and directors of YCA and while YCA was insolvent, Levine and Corrigan sold those medallions for $184 million (an average sale price exceeding $300,000 per medallion) but did not distribute any of the approximately $160 million in profit to YCA.

20.     Levine and Corrigan failed to use any of the $160 million in profit from the medallion sales to purchase additional insurance for YCA or to otherwise protect or capitalize the insolvent company.

### III. Defendants Forced YCA Out of Business and Formed a New Company to Keep YCA's $15 Million per year Revenue Stream from the Reach of Creditors.

21.     On March 17, 2015, a $26 million judgment was entered against YCA in the Jacobs lawsuit—a liability YCA's officers and directors had been aware of since 2005. YCA filed a Chapter 11 bankruptcy petition the next day (N.D. Ill. Bankruptcy Case No. 15-09539), relying on the automatic stay provided by section 362 of the Bankruptcy Code in lieu of a supersedeas bond.[1]

22.     During the Chapter 11 case, while YCA was still being controlled by its ultimate owners (Levine and Corrigan, who paid YCA's attorneys directly during the Chapter 11 case), YCA refused to agree with its creditors on a plan of liquidation or a sale of the company as a going concern. It became clear that YCA's officers, directors, and owners were not interested in selling the company. Defendants were determined to (a) keep YCA's $15 million per year in annual revenue for themselves and (b) avoid a sale that would distribute proceeds and cash from operations to YCA's creditors. So, they devised a scheme.

23.     The scheme involved two parts. First, TAS would abruptly terminate services to YCA as soon as the Trustee took over YCA's business so that the Trustee had no way to operate it and would therefore be forced to terminate the Affiliation Agreements (which were YCA's sole source of revenue). Second, Defendants would solicit YCA's longtime Members to leave YCA and join a new taxicab affiliation they would form to replace YCA. Once the Trustee was forced to terminate YCA's operations, the new taxicab affiliation formed by Defendants would swoop in to collect on those lucrative contracts.

---

[1] The Jacobs judgment was affirmed by the Illinois Appellate Court on March 16, 2017.

24.    On November 3, 2016, the Bankruptcy Court entered an order converting the Chapter 11 case to a Chapter 7 case effective November 16, 2016 (the "Conversion Date").

25.    On November 14, 2016, the interim Trustee filed a motion seeking authorization to operate the business of YCA.

26.    After business hours on the evening of November 15, 2016, TAS's counsel emailed the interim Trustee and advised that "[a]s of tomorrow, TAS will no longer provide services to Yellow Cab Affiliation, Inc." This notice, provided just hours before the conversion, breached TAS's agreement to provide YCA at least 30 days' notice of termination.

27.    On November 16, 2016, the Bankruptcy Court granted Trustee's motion to operate YCA.

28.    On November 17, 2016, Defendants secretly incorporated a new taxicab affiliation to take YCA's place: Yellow Cab Association, Inc. ("New YCA").

29.    In an effort to continue to rely on the brand, goodwill, and intellectual property of YCA (without paying for it), defendants made a subtle change: merely replacing the word *Affiliation* with *Association*. This made updating the website and logo on the side of the vehicles easy. It also allowed New YCA to leverage the history, color, and trade dress of the YCA brand that had been doing business in the Chicago area for 20 years. Unassuming customers did not even realize a completely new company had replaced YCA.  Even astute customers would have had to look hard to spot the single-word change in New YCA's otherwise identical logo:

7



30.     The interim Trustee, who had been in control of YCA for less than 24 hours, was forced to terminate all YCA business operations.

31.     Defendants used white tape to replace "Affiliation" with "Association" on the side of the taxicabs previously affiliated with YCA. Above is a copy of a photograph, taken in Chicago on November 11, 2017, showing the door of one of the re-affiliated New YCA taxicabs.

32.     Through this scheme, Levine, Corrigan, Moberg, Sakata, Tessler, TAS, Yellow Group, TMM, YMH, CLMH and others, were able to hinder and evade YCA's creditors, while continuing to pay themselves through TAS and a web of affiliated companies.

## PARTIES

33.     **Michael K. Desmond** is the duly appointed Trustee for YCA's bankruptcy estate.

34.     **Taxi Affiliation Services LLC** ("TAS") is a Delaware limited liability company whose principal place of business is located at 3351 W. Addison St. Chicago, IL 60618.

35.     **Michael Levine** ("Levine") was the president and a director of YCA. Levine was also the manager of TAS. Levine owns 85% of People Mover Inc., with Jason Kahan owning the

remaining 15%. People Mover Inc. owns 55% of Yellow Group LLC, which, in turn, owns 100% of TAS and other affiliated companies and owned YCA.

36. **Patton R. Corrigan** ("Corrigan") was an officer of YCA. Corrigan owned or owns 100% of Yellow Cab Partners LLC, which, owns 45% of Yellow Group LLC which, in turn, owns 100% of TAS and other affiliated companies and owned YCA.

37. **Gary Sakata** ("Sakata") was YCA's secretary and treasurer and also TAS's Chief Financial Officer. Sakata also is or was an officer of various companies affiliated with TAS and/or YCA, including (a) American United Taxi Affiliation, (b) Blue Diamond Taxi Association, (c) Checker Cab, Wolley Cab d/b/a Checker Cab Affiliation, (d) TaxiWorks, and (e) Taxi Medallion Management.

38. **John Moberg** ("Moberg") is the president of TAS and an officer/owner of newly formed Yellow Cab Association Inc.

39. **Evan Tessler** ("Tessler") was a director of YCA.

40. **Yellow Group LLC** ("Yellow Group") owned 100% of YCA, TAS, and other affiliated companies. Yellow Group is ultimately owned by Levine and Corrigan.

41. **People Mover Inc.** ("People Mover") owns 55% of Yellow Group. Levine owns 85% of People Mover Inc. Jason Kahan owns the remaining 15%.

42. **Yellow Cab Partners LLC** ("Yellow Cab Partners") owns 45% of Yellow Group. Corrigan owns 100% of Yellow Cab Partners LLC.

43. **Yellow Cab Association Inc.** ("New YCA") was incorporated on November 17, 2016, the day after YCA's Chapter 11 Bankruptcy Case was converted to a Chapter 7 case. New YCA (i.e., Yellow Cab *Association* Inc.) took the place of YCA (i.e., Yellow Cab *Affiliation*, Inc.) on websites formerly associated with YCA. New YCA has the same business address formerly

associated with YCA, TAS, and affiliated companies (3351 W. Addison St. Chicago, Illinois 60618). New YCA uses the same logo YCA used for 20 years on the side of Chicago taxi cabs (a circular logo with a wing surrounded by the words Yellow Cab).

44. **Yellow Medallion Holdings** ("YMH") is a Delaware limited liability company with its principal office located at 3351 W. Addison St., Chicago, IL 60618. YMH's members are Eatery Taxi Corp and Yellow Cab Partners. YMH is managed by Corrigan and Levine through companies they own and operate, Yellow Cab Partners LLC (owned by Corrigan) and Eatery Taxi Corp (Levine). YMH owns various limited liability companies that are medallion owners, including YC1 LLC, YC2 LLC, YC17 LLC, YC18 LLC, YC19 LLC, YC20 LLC, YC21 LLC, YC22 LLC, YC25 LLC, YC26 LLC, and YC56 LLC (the "YC Medallion Owners"). Each of the YC Medallion Owners is a licensed owner of multiple medallions in the City of Chicago and are former Members of YCA. These entities own 1-7 medallions each. Each of the YC Medallion Owners has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.

45. **CL Medallion Holdings LLC** ("CLMH") is a Delaware limited liability company with a registered agent located at Greentree Dr. Ste. 101, Dover DE. CLMH was incorporated by Levine in 2005 for the purpose of acquiring taxicab medallions in the City of Chicago. Upon information and belief, CLMH owns or owned approximately 29 limited liability companies that are medallion owners (the "CLMH Medallion Owners").

46. **Taxi Medallion Management LLC** ("TMM") is a Delaware limited liability company with its principal office located at 3351 W. Addison St., Chicago, IL 60618. TMM's managers are Michael Levine and Patton Corrigan. As license manager, TMM managed medallions owned by companies that (1) are owned by Michael Levine and Patton Corrigan and (2) were members

10

of YCA. Specifically, TMM is the "license manager" for the YC Medallion Owners, and the YC Medallion Owners paid affiliation dues to YCA through TMM.

47. All of the corporate defendants referred to above effectively operate as divisions of a single enterprise, controlled and manipulated by the named individual defendants.

## JURISDICTION AND VENUE

48. This Court has jurisdiction over this civil action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1334(a), 1338, and 1367 because the claims arise under the laws of the United States or are so related to such claims that they form part of the same case or controversy.

49. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

50. This is not a core proceeding under 28 U.S.C. § 157.

51. The Trustee does not consent to a final adjudication of these claims by the Bankruptcy Court.

52. Trustee demands a trial by jury.

## FACTS

53. On March 18, 2015 (the "Petition Date"), YCA filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), thereby commencing the case and creating YCA's estate (the "Estate").

54. YCA owned and managed a taxicab affiliation company in the greater Chicago area consisting of approximately 1,600 members. YCA's offices were located at 3351 W. Addison St. Chicago, IL 60618.

## I.   DEFENDANTS CREATE TAS AND TMM TO AVOID YCA'S JUDGMENT CREDITORS.

55.    On August 31, 2005, a YCA passenger and customer named Marc Jacobs suffered a traumatic brain injury while riding in the taxicab of a YCA Member due to the alleged negligence of the taxicab driver, who swerved violently towards a freeway exit ramp causing the taxicab to flip over.

56.    On September 15, 2005, Jacobs and his wife commenced a lawsuit seeking damages for their injuries. The Jacobses asserted a claim for negligence against the taxicab driver and the company that owned the medallion affixed to the subject taxicab (i.e. the YCA Member). The Jacobses also sought to hold YCA itself vicariously liable for the driver's negligence.

57.    On August 23, 2006, TAS was organized and began taking 100% of YCA's $15 million per year revenue.

58.    On September 11, 2006, TMM was organized and began charging YCA for "referral fees" and so-called services without providing any reasonably equivalent value to YCA.

59.    Levine, Sakata, Moberg, Tessler, and Corrigan (the "Officers and Directors") formed TAS and TMM, within a year after the Jacobs lawsuit was filed, because they anticipated a large judgment against YCA in that lawsuit and adverse judgments in other lawsuits.

60.    The Officers and Directors devised this scheme, whereby TAS took all of YCA's revenue, in order to keep YCA insolvent, undercapitalized, and judgment proof.

61.    In reality, from 2006 until the Petition Date, TAS collected and held all of YCA's receipts for Membership dues owed to YCA under YCA's Affiliation Agreements. YCA was rendered penniless. It did not even maintain its own bank account.

62. The scheme enabled the Officers and Directors to transfer funds that should have been paid to YCA to affiliated companies they owned and operated, such as TMM. In this way, the Officers and Directors insulated themselves from liability by rendering YCA insolvent so they could use YCA as a roadblock against creditors when a large judgment was entered against YCA.

63. YCA was the face of the Yellow Cab taxi enterprise in Chicago, the visible name and brand that customers riding in yellow taxi cabs in Chicago recognized.

64. Since its formation in 2006, the Officers and Directors have caused TAS to strip YCA of all of its revenue, without providing any invoices or obtaining proper approval, in violation of the Services Agreement between YCA and TAS.

65. Because YCA's officers were also TAS's officers who were benefitting from this scheme, the Officers and Directors never sought market rates from service providers other than TAS, never attempted to negotiate a better deal with TAS, and never questioned why YCA needed TAS to provide the same services YCA provided without TAS for many years.

66. Knowing that YCA was a named defendant in the Jacobs lawsuit and many other lawsuits brought by injured taxi cab passengers, the Officers and Directors intended to avoid paying any money judgment by keeping YCA's coffers empty and by choosing not to maintain any additional umbrella insurance.

67. The court-appointed examiner in the Chapter 11 case (the "Examiner") concluded in his report (the "Examiner Report") that YCA was thinly capitalized and historically commingled its

cash with the cash of other Yellow Group entities. (Examiner Report, Bankruptcy Case No. 15-09539, p. 27).[2]

## II.   PRE-PETITION FRAUDULENT TRANSFERS FROM YCA TO TAS

68.    The Services Agreement set forth services to be provided to YCA by TAS and payments to be made to TAS by YCA upon receipt of invoices from TAS for such services. A copy of the Services Agreement is attached hereto as **Exhibit A**.

69.    For each year since TAS's formation in 2006, YCA "paid" TAS an average of approximately $500,000 per month, or $6 million per year, ostensibly for services TAS was providing to YCA under the Services Agreement.

70.    TAS substantially overcharged YCA for its services, but the Officers and Directors of YCA did not object because the arrangement rendered YCA insolvent and judgment proof.

71.    The Services Agreement required payment only upon receipt of invoices. Despite that, YCA did not remit payments to TAS upon receipt of invoices from TAS. In fact, there were no invoices and there were no payments. Rather, TAS simply collected all YCA's revenue directly from YCA's Members, and then either kept it or transferred it to insiders, including the Officers and Directors and other affiliated companies.

72.    In other words, TAS disregarded the Services Agreement and treated YCA as its personal piggy bank.

73.    YCA did not solicit outside bids from providers other than TAS for any of the services covered by the Services Agreement prior to entering into the agreement with TAS or at any other

---

[2] On October 1, 2015, the Bankruptcy Court entered an order appointing Daniel Dooley as an Examiner in the Chapter 11 case.  [Dkt. No. 437]. On December 7, 2015, Mr. Dooley filed his report with the Court  ("Examiner Report").  [Dkt. No. 572].  The Trustee does not adopt the Examiner Report in its entirety as part of the allegations of this complaint.

time. YCA did not seek to obtain cashiering and dispatch services at competitive rates, nor did it attempt to provide these services in-house, as it previously had done. The plan was to overpay for these services, without invoices, and to leave YCA (the named defendant in the Jacobs lawsuit and other lawsuits) without anything to pay creditors.

74.     The Services Agreement was not commercially reasonable and was not negotiated at arm's length. The same Officers and Directors were on both sides of the agreement. It was a one-sided deal that not only gave TAS several million dollars per year in compensation, but also permitted TAS to be reimbursed for all direct and overhead expenses. Under this sweetheart deal, all of TAS's own overhead expenses were to be reimbursed by YCA.

75.     According to the Services Agreement, TAS was entitled to base compensation for its services as follows:

> i.      a base fee of $2,500 per month for services provided hereunder;
>
> ii.     for each month that the Association has in excess of twenty (20) affiliate members, then with respect to each such affiliate member in excess of twenty (20), an additional fee of $45 per affiliate member per week (based on the average number of affiliate members in the Association for each respective month), subject to reconciliation and adjustment within ninety (90) days after the end of each year to reimburse Service provider for the expenses described in Section 2(b).

76.     Section 2( b) of the Services Agreement provides for further compensation as follows:

> The Association agrees to pay and reimburse the Service Provider (or its designee) actual and direct out-of-pocket expenses (including fees and disbursements of attorneys, accountants and other professionals retained by the Service Provider in connection with services provided hereunder) incurred by the Service Provider and its personnel in performing services hereunder to the Association and its subsidiaries. In addition, the Service Provider shall be reimbursed by the Association for all direct costs it incurs on behalf of the Association for any selling, general and administrative costs (including accounting, bookkeeping, executive management, travel, telephone, data processing, and other overhead expenses) reasonably allocated by the Service Provider to services provided or performed on behalf of the Association. ***Any***

15

> *such reimbursement shall be payable by the Association promptly on the Service Provider's rendering of a statement therefor, together with such supporting data as the Association reasonably shall require.*

(Exhibit A at ¶ 2) (emphasis added). On its face, this contract was not commercially reasonable.

77.     In April 2015, one month after the Petition Date, TAS and YCA (then controlled by the Officers and Directors) alleged that it modified the Services Agreement retroactive to fifteen months earlier, January 1, 2014, to eliminate the collection and recognition of the base fee and additional fee, and to expand the scope of the expenses for which YCA would reimburse TAS.

78.     Contrary to the integration provision in paragraph 5(b) of the Services Agreement, this claimed modification allegedly was never reduced to writing, and was not signed on behalf of YCA or TAS. The alleged oral modification retroactive to a date 15 months earlier was unusual—all the more so given that YCA was operating in bankruptcy court at the time.

79.     Since TAS's formation, YCA never held any of the funds (approximately $15 million in revenue per year) to which it was entitled from its Members.

80.     The Officers and Directors and TAS made accounting entries showing alleged "payments" from YCA to TAS. Every time, the amount owed to TAS was always 100% of YCA's net revenue.

81.     These alleged YCA-to-TAS "payments" were not negotiated at arm's-length and did not reflect market value of services rendered.

82.     Due to the conflicts of interests of the officers of TAS and YCA and their common ownership and control, no officer or director of YCA ever (a) sought reduced rates from TAS, (b) demanded that TAS provide written statements or otherwise comply with its obligations under the Services Agreement, or (c) undertook any effort whatsoever to seek similar services from a different service provider.

83.     The services TAS provided to YCA, especially the telephone dispatch service, drastically diminished in scope and in value over the years, but the Officers and Directors kept charging the same amount to YCA, and never attempted to renegotiate prices. The Officers and Directors simply continued to overpay TAS for this antiquated service.

84.     Indeed, customer call volumes to YCA's call center diminished drastically in recent years as ride-sharing services and mobile applications largely replaced the practice of calling dispatch centers to request a taxicab.

85.     For example, in one year alone, call volume for YCA cabs went down by about 40 percent, from about 91,000 calls in January 2014 to about 59,000 calls in December 2014.

86.     Despite the drastic drop in call volume and attendant drop in value of TAS's dispatch services, TAS kept charging the same amount, and YCA did not attempt to re-negotiate the Services Agreement with TAS. As a result, YCA continued to pay inflated rates for "dispatch services" despite the greatly-reduced call volumes. Because TAS and YCA were sister companies with identical ownership and management, YCA's Officers and Directors made no effort to pursue the best interests of YCA, nor did they appear to notice that the interests of YCA and TAS were in conflict.

### III.     PRE-PETITION FRAUDULENT TRANSFERS FROM YCA TO TMM AND OTHER AFFILIATED COMPANIES

87.     YCA's officers claimed to perform an annual "reconciliation" of accounts between YCA and TAS pre-petition, and a monthly reconciliation of those accounts post-petition.

88.     According to Sakata, the purpose of these reconciliations was "[t]o account for any variable or unanticipated expenses borne by TAS for services provided to the Debtor[.]" (Sakata Declaration, Doc 11, Bankruptcy Case No. 15-09539).

89.     On September 21, 2016, the Official Committee of Unsecured Creditors in the Chapter 11 case ("Committee") received from YCA a reconciliation through August 31, 2016 ("the August 2016 Reconciliation").

90.     According to the August 2016 Reconciliation, for the *first half* of 2015, YCA "paid" TMM $289,156.00. Extrapolating from this figure, approximately $600,000 per year of YCA's revenues were paid to TMM without YCA receiving any value in return. Upon information and belief, these amounts were paid to TMM by TAS (which actually took *all* of YCA's revenue, as noted above) since 2006.

91.     The TMM charges to YCA relate to an alleged oral agreement regarding a weekly "referral fee" that was not scheduled in the bankruptcy case as required.

92.     This TMM "referral fee" was mentioned in a September 9, 2015 Declaration of John Moberg:

> Until 2013, **Taxi Medallion Management, LLC** managed medallions for Members in three taxicab affiliations, including 600 Members of Yellow Cab Affiliation, Inc. In exchange for receiving a fixed monthly fee, Members allowed Taxi Medallion Management to manage the day to day operations of their taxicab business. Taxi Medallion Management earned revenue through lease payments from the drivers. TAS collected those lease payments and applied a portion of that revenue to cover the dues owed by the corresponding Member. Taxi Medallion Management also arranged for advertising in the taxicabs and collected the revenue from that advertising. Taxicab affiliations, including Yellow Cab Affiliation, Inc., do not take part in procuring this advertising or share in the revenue. After 2013, Taxi Medallion Management began subcontracting out management of medallions to others. **It began collecting a $3 per medallion referral fee from taxicab affiliations, including Yellow Cab Affiliation, Inc.**

(Declaration of John Moberg in Support of the Opposition of the 18 Related Companies to the Committee of Unsecured Creditors' Motion to Compel, *Dkt. No.* 404-2) (emphasis added).

93.     Per the Examiner Report, "TMM is the licensed manager for 679 medallions, of which at least 46 are owned by Michael Levine and Patton Corrigan[.]" (Examiner's Report, p. 39). But, it is unclear why YCA was charged for this fee at all.

94.     Upon information and belief, TMM did not provide services to YCA in exchange for the "referral fee".

95.     The "agreement" between YCA and TMM regarding this "referral fee", if it existed at all, was oral and was not properly disclosed in the bankruptcy case.

96.     Even if some kind of service was provided to YCA by TMM, the approximately $20,000 weekly charge appears to have been based on **1,600** affiliation members ($3/week * 1,600 members * 4 weeks = $19,200). Extrapolating from this figure, YCA paid TMM approximately $1,040,000 per year without receiving any value in exchange.

97.     According to the Examiner's Report, only **679 medallions** had any relationship with TMM. Even if TMM were providing a service to YCA, it should have been based on, at most, the 679 medallions that had some kind of relationship with TMM—not all 1,600 medallions. In other words, TMM inexplicably charged YCA a "referral fee" related to about 921 cabs[3] with which it had absolutely no relationship.

**IV.     OVERLAPPING MANAGEMENT AND OWNERSHIP CREATED CONFLICTS OF INTEREST FOR YCA'S OFFICERS AND DIRECTORS.**

98.     YCA's officers (Michael Levine, Patton Corrigan, and Gary Sakata) and directors (Levine and Evan Tessler) used their positions of trust and confidence to further their private interests to the detriment of YCA and its creditors.

---

[3] 1,600 – 679 = 921

### A. Conflicted Officers and Directors

99.    Until the Conversion Date, YCA was a wholly-owned subsidiary of Yellow Group.

100.    Yellow Group's managers pre-petition and until the Conversion Date were Levine and Corrigan.

101.    The directors of YCA pre-petition and until the Conversion Date were Levine and Tessler.

102.    YCA's officers pre-petition and until the Conversion Date were Levine, Corrigan, and Sakata.

103.    Levine is or was TAS's manager; Moberg is TAS's president; and Sakata is or was TAS's Chief Financial Officer.

104.    YCA's officers and directors pre-petition and until the Conversion Date were hopelessly conflicted.

105.    Levine was both YCA's president and TAS's manager.

106.    Sakata was both YCA's secretary and treasurer and TAS's Chief Financial Officer.

107.    The Examiner found that "[g]enerally directors of the various [Yellow cab] entities are comprised of a portion of a group consisting of Michael Levine, Patton Corrigan, Evan Tessler and John Moberg."  (Examiner's Report, p. 20).

108.    Due to their overlapping positions and conflicts of interests, the officers of YCA failed to act in the best interests of YCA, and instead placed the interests of other affiliated companies they controlled, and themselves, ahead of the interests of YCA and its creditors.

109.    Among other things, YCA entered into the unfavorable Services Agreement with TAS that allowed TAS to completely control YCA and siphon off all of YCA's revenue.

110.     YCA's officers and directors furthered their private interests at the expense of YCA by (a) transferring all of YCA's revenue to TAS and then (b) transferring funds from TAS to themselves or other companies they owned and/or controlled, including TMM, YMH, CLMH, and Yellow Group.

111.     By way of example, Levine and Corrigan caused TAS to pay them at least $3 million in "management fees" from 2013 to 2014. These funds came from revenue generated by and owed to YCA.

112.     Sakata, the secretary and treasurer of YCA, did not seek market rates for services provided by TAS to YCA because he was also the chief financial officer of TAS.

113.     Although he was an officer of YCA, Sakata took direction from Moberg, TAS's president. Sakata considered Moberg his boss and took instruction from Moberg to the detriment of YCA.

### B.     TAS's Notice of Non-Renewal of Services

114.     On October 29, 2015, TAS sent a letter titled Notice of Non-Renewal and Termination – Services Agreement (the "Non-Renewal Letter") to YCA. A copy of the Non-Renewal Letter is attached hereto as **Exhibit B**.

115.     The letter is signed by Moberg and is addressed to the attention of Gary Sakata (who was the Chief Financial Officer for TAS and the secretary and treasurer of YCA at the time).

116.     The Non-Renewal Letter states that TAS will not renew the Services Agreement but that TAS will continue to provide services on a month-to-month basis "**terminable by either party at any time upon <u>not less than thirty (30) days written notice</u>** and otherwise upon mutually agreeable terms and conditions." (*Id.*, emphasis added).

21

117.    After receiving this letter, Sakata and the other Officers and Directors of YCA took no action to search for or obtain another service provider that could provide services to YCA were TAS to abruptly terminate its services to YCA.

118.    The Officers and Directors had no assurances from TAS that TAS would continue to provide services to YCA but continued to operate without even attempting to plan for the contingency of TAS terminating services.

119.    Despite the fact that TAS was YCA's sole service provider and could effectively put YCA out of business upon termination of its services to YCA, the Officers and Directors never even looked for or considered a replacement for TAS or develop any kind of plan in the event TAS terminated its services.

## V.    TAS TRANSFERS FUNDS TO LEVINE, CORRIGAN, AND AFFILIATED COMPANIES.

120.    Since its formation in 2006, TAS made regular payments to Levine and Corrigan and to entities that Levine and Corrigan owned and/or controlled.

121.    In 2013, TAS paid Levine $108,000 per month in alleged "management fees" and paid Corrigan $92,000 per month in alleged "management fees".

122.    In 2014, TAS paid Levine $99,360 per month and Corrigan $84,640 per month for such alleged fees.

123.    TAS paid Levine and Corrigan "management fees" in 2013 and 2014 of at least $3 million.

124.    Upon information and belief, TAS transferred similar amounts to Levine and Corrigan, or entities they owned and controlled, between 2006 and 2012.

125.     These payments were made with funds that were taken from YCA by TAS's systematic gouging of YCA.

126.     Levine, Corrigan, and the entities they owned and controlled that received payments from TAS did not provide services to TAS that were necessary or reasonably equivalent in value to the payments received.

## VI.     TAS FORCES YCA OUT OF BUSINESS AND DEFENDANTS FORM NEW YCA TO STEAL YCA'S MEMBERS AND REVENUE.

127.     Effective on November 16, 2016, YCA's Chapter 11 bankruptcy case was converted to a case under Chapter 7 of the Bankruptcy Code.

128.     The Trustee was provisionally appointed, on an interim basis, as the Chapter 7 trustee of the estate on the Conversion Date, pursuant to 11 U.S.C. § 701(a)(1).

129.     The very next day, November 17, 2016, defendants formed New YCA to strip YCA of its sole source of revenue, its medallion-holding members.

130.     The Officers and Directors conspired to form New YCA and solicit YCA's Members to leave YCA and join New YCA, so that the income stream from the medallion-holding dues payments under the Affiliation Agreements formerly held by YCA would now flow to New YCA (and its ultimate owners and operators) instead of to YCA and its creditors.

131.     As of the Conversion Date, YCA had more than 1,364 member Affiliation Agreements. The Affiliation Agreements required members to pay dues to YCA on a weekly basis of approximately $195.00 per week. In addition, the Members were required to post a refundable security deposit with YCA. An example of a typical Affiliation Agreement is attached hereto as **Exhibit C.**

132.    During the course of the Chapter 11 case and leading up to the Conversion Date, the Officers and Directors, TAS, Yellow Group and other affiliated companies and persons actively conspired to form New YCA and to cause YCA's members to leave YCA and re-affiliate with New YCA.

133.    The Trustee appeared in Bankruptcy Court on the Conversion Date.

134.    Leading up to that appearance, the Trustee was negotiating in good faith with TAS regarding services TAS provided to YCA.

135.    The interim Trustee had planned to continue to operate YCA as a going concern for a period of time and to sell YCA to maximize distributions to its creditors.

136.    Although the services TAS provided to YCA were overpriced, the Trustee needed TAS's services for a limited time in order to operate the company during the Chapter 7 case until he could sell the company as a going concern and/or contract with a new services provider.

137.    Leading up to and after the Conversion Date, the Officers and Directors, TAS, Yellow Group and other affiliated persons and entities solicited YCA's members to leave YCA and join other taxicab affiliations that were wholly owned by Yellow Group and, later, to join New YCA. New YCA did not receive a license from the City of Chicago until 30 to 60 days after it was incorporated on November 17, 2016.

138.    As part of their scheme to put YCA out of business and to steal YCA's Members, Levine, Sakata, Moberg, Tessler, Corrigan, TAS, Yellow Group and other affiliated entities and persons arranged for TAS to abruptly terminate services to YCA so that YCA would be forced to cancel its Affiliation Agreements.

139.    As noted above, TAS indicated in the Non-Renewal Letter that it could terminate services upon 30 days' notice. But, as noted above, TAS disregarded its Non-Renewal Letter and

24

terminated services immediately on November 17, 2016, at the very moment the Trustee was in the courtroom advising the bankruptcy court of his plans to operate the company.

140. Leading up to the Conversion Date, the Trustee attempted to negotiate a contract with TAS (since YCA's officers and directors had previously neglected to do so) under which TAS would continue to provide services to YCA for a temporary period of time during which the Trustee would operate YCA and get the company ready to be sold as a going concern for the benefit of the creditor estate. TAS refused and abruptly terminated services to YCA.

141. This gave the Trustee no other choice but to cease YCA's operations immediately and simultaneously give notice to YCA's dues-paying Members.

142. On that same day (November 17, 2016), the Trustee visited YCA's offices and encountered a posted notice within the office advising YCA's Members that TAS "has ceased to provide services to YCA, including cashiering and the licensing of the Yellow Cab colors and phone number" and that the "rights to the Yellow Cab colors and phone number are now being licensed to Checker Taxi Affiliation and American United." A copy of the Trustee's Termination Notice is attached hereto as **Exhibit D**.

143. Checker Taxi Affiliation and American United are ultimately owned by Levine and Corrigan.

144. The Trustee took a photograph of the notice posted at 3351 W. Addison St. Chicago, IL 60618 on November 17, 2016, a copy of which is included here:

NOTICE TO MEMBERS OF YELLOW CAB
AFFILIATION (YCA):

Taxi Affiliation Services (TAS) has ceased to
provide services to YCA, including cashiering and
the licensing of the Yellow Cab colors and phone
number. The rights to the Yellow Cab colors and
phone number are now being licensed to Checker
Taxi Affiliation and American United and will be
available solely for use by members of those
Affiliations.

145.    This Notice to Members of Yellow Cab Affiliation was created on or before the

Conversion Date and shows that defendants, including Levine, Corrigan, Sakata, Tessler, and

TAS, conspired to cause YCA to fail so that they could steal its Members and the revenue stream

that came with them.

146.    Upon termination, YCA's Members could not immediately re-affiliate with New YCA

because New YCA did not yet have a license from the City of Chicago.

147.    Upon information and belief, due to the actions of Levine, Sakata, Moberg, Tessler,

Corrigan, and TAS, many of YCA's taxicab drivers operated illegally for approximately six

weeks, without being affiliated with any taxicab affiliation, in violation of City of Chicago

ordinances.

148.    Approximately 100 to 200 YCA members re-affiliated with a taxicab affiliation called

Taxi Town.

149.    The majority of the YCA Members (approximately 1,100) temporarily re-affiliated with

other cab companies ultimately owned by Levine and Corrigan and controlled by the Officers

and Directors.

26

150.     Once New YCA obtained a license from the City of Chicago in January 2017, these Members then contracted with New YCA, which is wholly owned by Moberg, a longtime officer of TAS and colleague of Levine and Corrigan.

151.     By (1) abruptly terminating TAS's services to YCA, (2) forming New YCA, and (3) soliciting YCA's Members to leave YCA and join New YCA and other affiliations, Levine, Sakata, Moberg, Tessler, Corrigan, TAS, and other defendants effectively converted YCA's assets and its revenue stream (Membership dues of approximately $15 million per year under the Affiliation Agreements and YCA's equipment in the front of the taxicabs) without paying a dime, leaving YCA hopelessly insolvent and its creditors unpaid. Upon information and belief, the company generates at least $4 million per year in profit.

152.     This collusion to extinguish YCA and steal its Members was a calculated undertaking by the Officers and Directors, TAS, Yellow Group and other affiliated persons and entities.

### VII.     NEW YCA'S CONVERSION AND CONTINUED UNAUTHORIZED USE OF YCA'S EQUIPMENT

153.     YCA owns all of the "front of cab" equipment in approximately 1,600 City of Chicago licensed taxicabs that were Members of YCA as of the Petition Date. This equipment included mobile data terminals and other mechanical/electronic equipment in all YCA taxicabs. Defendants, including TAS, New YCA, Moberg and others, converted YCA's equipment and refused to return it. It is now being illegally used by New YCA without authorization.

154.     On November 18, 2016, the Trustee demanded turnover of all of the equipment from TAS. A copy of Trustee's demand letter is attached hereto as **Exhibit E**. TAS, thorough its counsel, refused to comply with the Trustee's demand.

27

155.    Without that equipment, New YCA could not operate. Defendants know that the equipment belongs to YCA but refuse to return it or require New YCA's members to turn in the equipment.

156.    The Officers and Directors negligently or recklessly failed to maintain an inventory of equipment or adequate control of YCA's equipment.

157.    YCA continues to be deprived of the value of its equipment due to the actions of the Officers and Directors, TAS, and New YCA.

### VIII.    NEW YCA RELIES ON YCA'S TRADE DRESS TO JUMP-START ITS BUSINESS

158.    Since its inception in 1996, YCA and its Members have utilized an unregistered, distinctive visual arrangement on YCA taxicabs comprising a distinctive yellow color and a circular insignia (stating "Yellow Cab Affiliation, Inc.") and telephone number "312-Taxi-Cab" on the rear doors (collectively, the "Trade Dress").

159.    The circular insignia is a design mark owned by YCA's former parent, Yellow Group (Reg. No. 2299408).

160.    YCA utilized the design mark in connection with its Trade Dress under a license from Yellow Group.

161.    Yellow Group does not own the name Yellow Cab Affiliation, Inc. or the yellow color associated with the taxicabs.

162.    Yellow Group did not register the yellow color and expressly disclaimed the words "Yellow Cab Affiliation, Inc."

163. YCA has continuously used the Trade Dress, including the yellow color scheme, in connection with its taxicab services in Illinois since at least 1996 until it ceased doing business in late 2016.

164. YCA was the only taxi affiliation to utilize the Trade Dress, including the yellow color scheme, during this time period. All taxicab vehicles belonging to a single taxicab affiliation must display that affiliation's uniform color scheme and logo, approved by the commissioner before being painted and displayed on the vehicles, and ***not duplicative of, or substantially similar to, an existing affiliation's color scheme and logo.*** Chicago, Ill., Mun. Code of Chi. § 9-112-360 (2012).

165. During YCA's twenty years of operation, it developed a large and loyal customer base, a good reputation, and a track record of quality service that customers associated, and continue to associate, with yellow-painted taxicabs in the Chicago area.

166. New YCA is a brand new taxi affiliation. It has no customer base, no track record, no history, and no assurance of quality in the minds of customers. Therefore, in order to jump-start its taxi business and allow it to instantly compete with other taxi affiliations already in operation, New YCA adopted the exact yellow color and virtually identical trade dress that had been used by YCA.

167. This allowed New YCA to trick consumers into believing that New YCA *was* YCA, when in reality it is an entirely separate affiliation.

168. Indeed, the only change New YCA made in the appearance of their cabs was a small white sticker that changed the name at the bottom of the logo from "Yellow Cab Affiliation" to "Yellow Cab Association."

29

169. This change was intentionally designed to avoid notice. Due to the subtlety of the change, consumers are unlikely to notice any difference whatsoever, and are led to believe that New YCA is associated with YCA.

170. Literally overnight, New YCA gained the patronage of the customers of Chicago's oldest and most distinctive taxi affiliation—for free. This scheme prevented YCA from resuming operations, and prevented the Trustee from selling YCA as a going concern in the bankruptcy case.

171. New YCA uses YCA's Trade Dress, including the yellow color, in Illinois and in inter-state commerce.

172. Taxicabs affiliated with New YCA cross state lines, including from the State of Illinois to the State of Indiana.

173. Taxicabs affiliated with New YCA also pick up international and domestic travelers from various states at O'Hare International Airport and Midway International Airport.

174. New YCA advertises to out-of-state customers online.

## IX. ACQUISITION AND SALE OF MEDALLIONS

175. In 2005, North Fork Bank loaned $22 million to entities owned or controlled by Levine and Corrigan to finance the acquisition of Chicago taxicab medallions and/or refinance existing loans that financed the acquisition of Chicago taxicab medallions (the "Medallion Loan").

176. TAS was or became a co-borrower on the Medallion Loan.

177. There were four other co-borrowers on the Medallion Loan.

178. The Medallion Loan was recorded on the books of TAS.

179. TAS was jointly and severally liable for the repayment of the Medallion Loan.

180. TAS was the only co-borrower of the five on whose books the debt was placed.

30

181.    TAS paid the debt service on the Medallion Loan.

182.    On information and belief, TAS paid debt service (primarily interest) on the Medallion Loan in the aggregate amount of $10 million.

183.    Entities owned and controlled by Levine and Corrigan, including YMH and CLMH, used, at least in part, YCA's revenue to acquire up to 542 medallions at an average purchase price of approximately $45,000 per medallion.

184.    From 2012 to 2014, while YCA was insolvent, Levine and Corrigan sold those medallions (through YMH and CLMH) for $184 million, an average sale price exceeding $300,000 per medallion.

185.    No distribution of any of the approximately $160 million in profit from the medallion sales was made to YCA or TAS.

186.    Without YCA's revenues, Levine and Corrigan would not have been able to obtain $160 million in profits from the sale of these medallions.

## X.    DEFICIENT AND DELINQUENT ACCOUNTING

187.    The Officers and Directors acted negligently and/or recklessly by failing to keep accurate accounts and records of YCA's finances.

188.    The accounting process and records were completely intertwined at YCA, TAS and other affiliations owned by Yellow Group.

189.    The Examiner reached the following conclusions about the accounting practices of the Officers and Directors who controlled YCA, TAS and other affiliated companies:

     i.      "Accounting is performed significantly after the fact due to shortages in skills, manpower and priority";

    ii.      "Accounting transactions are very voluminous";

iii.    "Accounting balances for related party transactions contain numerous errors."
(Examiner's Report, p. 5).

190.    YCA's cash was commingled with the cash of TAS. (Examiner's Report, p. 27).

191.    Balances owed between TAS and YCA and related entities "are relatively meaningless in
regards to the actual operations of the companies as they are commingled on a cash basis for all
practical purposes; the general ledger accounting is not recorded concurrently with cash
transactions." (Examiner's Report, p. 33).

192.    "Cashiering for both driver and medallion owner transactions are fully handled by TAS
with all funds commingled into one bank account and later segregated by entity via journal entry,
which may not be entered until month-end or several months later." (Examiner's Report, p. 25).

193.    Treasury across YCA, TAS and related entities "operates on a commingled basis" and
"appears to serve as a financing source for StickOutSocial, American Resources, and some of the
medallion holding companies." (Examiner's Report, p. 31).

194.    TAS demonstrated an "inability . . . to maintain accurate and timely accounting[.]"
(Examiner's Report, p. 92).

195.    Similarly, "YCA's accounting activity is not recorded timely or concurrently."
(Examiner's Report, p. 49).

196.    At the time of the Examiner's Report, "TAS [was] running 3-6 months behind in
recording and reconciling accounting data." (Examiner's Report, p. 35).

197.    At the time of the Examiner's Report, "TAS [was] still finalizing general ledgers for July
2015 onwards." (Examiner's Report, p. 49).

198.    The Examiner concluded that balance sheets of TAS and/or YCA had incorrect data that
may result in "nonsensical data such as negative fixed assets." (Examiner's Report, p. 49).

32

199.    YCA and TAS did not create or maintain financial statements and did not provide any to the Examiner.

200.    Accounting balances between YCA, TAS and related parties "contain numerous errors." (Examiner's Report, p. 5).

201.    The assets and liabilities of TAS and YCA are so disorganized and unreliable that the Examiner, a forensic accountant who was ordered to have full access to YCA's financial information, was unable to determine the intercompany balances between YCA, TAS, and related parties.

202.    The Examiner also concluded that:

    i.    "Significant account clean-up activity was noted to have been recorded each year to offset intercompany receivables and payables, to reclassify activity between accounts and between entities, and to correct errors; these correcting entries were significant in magnitude, thus making it difficult to accurately identify actual balances owed to individual entities." (Examiner's Report, p. 33)

    ii.    "The intercompany balances between TAS and the post-petition YCA do not agree and are different by a net $448k." (Examiner's Report, p. 82)

    iii.    "The records for TAS do not agree with either the pre-petition YCA books or the post-petition YCA books." (Examiner's Report, p. 69)

    iv.    "At June 2015, it was noted the balances due to and from TAS and TMM were unreconciled on the TAS and TMM general ledgers with an unidentified difference of approximately $550k." (Examiner's Report, p. 69)

    v.    TAS maintains separate general ledger accounts for its transactions with the pre- and post-petition YCA entities. However, the intercompany balances do not agree and require further reconciliation. (Examiner's Report, p. 82)

    vi.    The Examiner compared the related party balances due to and from other related entities to the general ledgers for those entities. Though not all balances were compared, several were noted to be unreconciled. (Examiner's Report, p. 69)

## XI.    CONTROL OF YCA BY TAS AND OTHER INSIDERS

203.    From the moment TAS was created, YCA was completely controlled by TAS and structured to benefit TAS, Yellow Group, the Officers and Directors personally, and other insiders.

204.    The assets and liabilities of YCA and other entities under the Yellow Group umbrella of companies were operated together as one company that did not timely or accurately account for intercompany transfers. Intercompany ledger-entry adjustments were made years after the fact in an effort to "zero out" balances.

205.    YCA, TAS, Yellow Group, YMH, CLMH, and TMM all had common ownership.

206.    YCA, TAS, Yellow Group, YMH, CLMH, and TMM all operate out of the same office and share officers and directors.

207.    Given its thin capitalization and inadequate insurance, Defendants actions caused YCA to become insolvent in 2005 when the Jacobs lawsuit was commenced, if not before.

208.    At all times after YCA became insolvent, YCA's officers and directors continually failed to act in the best interests of YCA, and instead placed the interests of TAS and other Yellow Group companies, as well as their own interests, ahead of the interests of YCA and its creditors.

209.    YCA maintains no records. TAS controls "YCA's" books, records, accounts, data, personnel, and email.

210.    YCA's cash has been and continues to be commingled with the cash of TAS. (Examiner's Report, p. 27). Balances owed between TAS and YCA and related entities "are relatively meaningless in regards to the actual operations of the companies as they are commingled on a cash basis for all practical purposes; the general ledger accounting is not recorded concurrently with cash transactions." (Examiner's Report, p. 33). "Cashiering for both

driver and medallion owner transactions are fully handled by TAS with all funds commingled into one bank account and later segregated by entity via journal entry, which may not be entered until month-end or several months later." (Examiner's Report, p. 25).

211.    Dues owed to YCA by its Members were not remitted directly to YCA; they were remitted to a TAS account where they were commingled with funds of the other affiliations and related entities.

212.    YCA did not solicit outside bids for any of the services covered by the Services Agreement prior to entering into it with TAS. Given the vague language of the agreement, TAS had nearly complete discretion under the Services Agreement to charge YCA what it deems appropriate for services it provides.

213.    Due to Defendants' actions, as described above, YCA became a corporate entity improperly used by the Officers and Directors, Yellow Group, and TAS to insulate Defendants from liability stemming from risks known to be attendant to the taxicab industry (i.e. personal injury liability arising from taxicab accidents).

214.    The Officers and Directors are liable for any claims against the corporate Defendants.

## COUNT I.
## BREACH OF FIDUCIARY DUTY
### (Against the Officers and Directors)

215.    Trustee repeats and realleges each and every allegation set forth above.

216.    Levine, Sakata, Corrigan, and Tessler ("YCA's Officers and Directors"), owed fiduciary duties, including duties of loyalty, care, and good faith, to YCA and its creditors

217.    YCA's Officers and Directors used their positions of trust and confidence to further their private interests to the detriment of YCA and its creditors.

35

218.    Due to their overlapping positions as officers, directors and/or owners of YCA, TAS, and other affiliated companies, YCA's Officers and Directors were conflicted and negligently, recklessly, and/or intentionally failed to act in the best interests of YCA.

219.    YCA's Officers and Directors breached their fiduciary duties to YCA and its creditors in several ways, including but not limited to, the following.

### A.    Transferring YCA's Revenue to Insiders to Make YCA Judgment Proof

220.    First, YCA's Officers and Directors caused TAS to be the recipient of all revenues owed to YCA.

221.    YCA's Officers and Directors negligently, recklessly, and/or intentionally caused YCA to enter into an unfavorable Services Agreement with TAS that allowed TAS to completely control YCA and siphon off all of YCA's revenue.

222.    YCA's Officers and Directors negligently, recklessly, and/or intentionally used YCA's revenue while YCA was insolvent to (a) to pay Levine and Corrigan at least $3 million of alleged management fees in 2013-14 and on information and belief, for similar amounts since 2006, (b) pay a "referral fee" to TMM of about $1 million per year since 2006 without receiving reasonably equivalent value in exchange, and (c) to avoid payments to creditors, including the Jacobses, whose claim became known to Levine, Corrigan, Sakata, and Tessler in 2005.

223.    YCA's Officers and Directors also acted negligently and/or recklessly and breached their fiduciary duties to YCA by, among other things (1) hopelessly comingling YCA's cash receipts with funds of TAS and other affiliations and related entities, (2) overpaying TAS for services, (3) failing to request that TAS comply with its obligations under the Services Agreement, including sending invoices to YCA for services rendered, (4) failing to take any action to renegotiate the Services Agreement, (5) failing to solicit bids from other vendors who could provide services

similar or identical to the ones TAS provided to YCA, and (6) failing to search for another service provider to replace TAS after TAS gave notice in October 2015 that it could terminate its services to YCA upon 30 days' notice effective December 2015.

224.    Moberg aided and abetted in this breach of fiduciary duty by assisting Levine, Sakata and Corrigan, and Tessler in creating TAS, arranging the structure whereby TAS took all of YCA's revenue, and distributing that revenue to insiders, leaving YCA insolvent.

**B.      Acquiring and Selling Medallions for Enormous Profit While YCA is Insolvent**

225.    Second, while YCA was insolvent, YCA's Officers and Directors, breached their duties of loyalty, care and good faith to YCA by using YCA's revenue to (a) acquire Chicago taxicab medallions, (b) refinance loans secured by Chicago taxicab medallions, and/or (c) pay debt service on loans used to acquire medallions or refinance loans that were used to acquire medallions.

226.    YCA's Officers and Directors, through YMH and CLMH, eventually sold the medallions acquired and/or financed with YCA's revenue for $184 million.

227.    YCA's Officers and Directors and/or affiliated companies they owned and/or controlled collected $160 million in profit from the sale of medallions but did not distribute any of the $160 million profit to YCA.

228.    YCA's Officers and Directors negligently, recklessly, and/or intentionally did not purchase umbrella insurance for YCA or contribute capital contributions to YCA since at least 2005.

**C.      Stealing YCA's Members and Assets with New YCA**

229.    Third, YCA's Officers and Directors breached their fiduciary duties of loyalty, care and good faith to YCA by intentionally interfering with and actively conspiring to diminish YCA's

membership, which was the company's sole source of revenue. Among other things, such actions prevented YCA's estate from selling the company's operations as a going concern in the bankruptcy, to the detriment of YCA and its creditors.

230.    YCA's Officers and Directors solicited YCA's Members to join other affiliations under their control, including Checker and American United, and later induced YCA's Members to join New YCA. and abruptly with less than 24 hours' notice terminated TAS's services to YCA in violation of TAS's own Non-Renewal Letter.

231.    YCA's Officers and Directors breached their duties to YCA by forming New YCA as a mechanism to steal YCA's Members and YCA's assets without paying YCA anything in exchange. Moberg aided and abetted in this breach of fiduciary duty by assisting Levine, Sakata and Corrigan, and Tessler by terminating TAS's services to YCA and forming New YCA.

232.    New YCA operates in the same field of business as YCA and generates revenue in the exact same way YCA generated revenue, i.e. from membership fees under the Affiliation Agreements.

233.    YCA's Officers and Directors usurped corporate opportunities reasonably incident to YCA's then present and prospective operations by causing TAS to terminate services to YCA for no other reason than to force YCA out of business so they could profit from New YCA.

234.    Moberg aided and abetted in these breaches of fiduciary duties by assisting YCA's Officers and Directors in terminating TAS's services to YCA and forming New YCA.

**D.    Failing to Collect YCA's Receivables and Maintain Accurate Accounts**

235.    Fourth, YCA's Officers and Directors breached their fiduciary duties of loyalty, care and good faith to YCA by (1) failing to collect receivables owed to YCA, (2) failing to keep accurate accounts and records, and (3) permitting conflicted officers and directors to operate YCA.

38

### E. Placing the Interests of Others Ahead of YCA's Interests

236.     Finally, YCA's Officers and Directors breached their fiduciary duties of loyalty, care and good faith to YCA by taking all of the actions described above for the benefit of themselves and the other Defendants at the expense of YCA.   Such actions, whether negligent, reckless or intentional, wrongfully placed the interests of the Defendants ahead of the best interests of YCA and its creditors, and diverted assets from YCA to Defendants that could have been used to pay YCA's obligations.

237.     As a direct and proximate result of YCA's Officers and Directors' breaches of fiduciary duty, YCA sustained significant damage. To the extent TAS and/or Yellow Group were controlling persons of YCA, they also owed fiduciary duties to YCA, the breach of which proximately caused the same damage to YCA in the same ways alleged above.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

          a)     Awarding Trustee all damages arising out of and caused by Defendants' conduct; and

          b)     Granting such other relief as this Court deems just and proper.

### COUNT II.
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
#### (Against TAS, New YCA, and the Officers and Directors)

238.     Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

239.     As of the Petition Date, YCA had valid and enforceable Affiliation Agreements with approximately 1,600 affiliated Members.

240.     As of the Conversion Date, YCA's Members count had diminished to 1,364.

241. TAS, New YCA, Levine, Sakata, Moberg, Tessler and Corrigan knew of the contractual relationships between YCA and its Members.

242. TAS, New YCA, Levine, Sakata, Moberg, Tessler and Corrigan intentionally, and without justification, induced YCA's Members to breach their Affiliation Agreements with YCA and re-affiliate with New YCA and/or other taxicab affiliations.

243. Upon information and belief, YCA's Members breached their Affiliation Agreements with YCA as a result of the intentional and unjustified inducement of TAS, New YCA, and the Officers and Directors.

244. Since TAS's creation in 2006, YCA has lost profits of approximately $3 million per year as a result of TAS's taking of 100% of YCA's revenue without providing reasonably equivalent value to YCA.

245. In addition, Defendants' conduct described herein caused YCA, which could have sold its operations as a going concern for valuable consideration, to go out of business for no consideration.

246. As a direct and proximate result of Defendants' tortious interference, YCA sustained significant damage.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

a) Awarding Trustee all damages arising out of and caused by Defendants' conduct; and

b) Granting such other relief as this Court deems just and proper.

## COUNT III.
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
### (Against TAS, New YCA, and the Officers and Directors)

247.    Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

248.    At all times relevant to this claim, YCA had a reasonable expectation of entering into a valid business relationship with future members and continuing to do business with its current Members.

249.    At all times relevant to this claim, TAS, New YCA, and the Officers and Directors were aware of YCA's reasonable expectation of entering into new affiliation agreements and maintaining and renewing its existing Affiliation Agreements.

250.    TAS, New YCA, and the Officers and Directors intentionally and actively conspired to prevent YCA from forming additional business relationships with current Members and future members by (a) inducing YCA's Members to leave YCA and re-affiliate with New YCA and other taxicab affiliations and (b) abruptly terminating TAS's services to YCA, which forced YCA to cease operations.

251.    YCA has lost profits of at least $3 million per year as a result of Defendants' conduct.

252.    Defendants' conduct described herein forced YCA out of business.

253.    YCA could have sold its operations as a going concern for valuable consideration but for the conduct of Defendants.

254.    As a direct and proximate result of Defendants' tortious interference, YCA sustained significant damage.

       WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

a) Awarding Trustee all damages arising out of and caused by Defendants' conduct; and

b) Granting such other relief as this Court deems just and proper.

## COUNT IV.
## PRE-PETITION FRAUDULENT TRANSFERS TO TAS
## 740 ILCS 160/5 - ACTUAL INTENT
## (Against TAS)

255.   Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

256.   YCA entered into an unfavorable Services Agreement with TAS that allowed TAS to completely control YCA and siphon off all of YCA's cash and profits.

257.   Defendants, including the Officers and Directors, caused YCA to transfer to TAS approximately $5 million per year since 2006.

258.   The transfers of YCA's revenue to TAS (i.e. from YCA's Members to TAS) were made with the actual intent to hinder, delay, or defraud YCA's creditors, including the Jacobses, whose claim became known to TAS and the Officers and Directors in 2005.

259.   The transfers were made with actual intent to defraud creditors, as evidenced by the following badges of fraud:

i.   The transfers were made to an insider. The transfers of YCA's funds were made initially to TAS, and then to the Officers and Directors, TMM, Yellow Group, YMH, CLMH and other affiliated companies controlled by Levine and Corrigan. When the debtor is a corporation, an "insider" includes a "person in control of the debtor." 740 ILCS 160/2(g). TAS, Yellow Group, and the Officers and Directors controlled YCA until the Conversion Date.

ii.     The transfers were concealed. TAS, Yellow Group, TMM, and the Officers and Directors did not disclose these transfers. TAS did not even provide written statements regarding services provided to YCA in violation of their Services Agreement. The Officers and Directors and TAS intentionally did not provide written statements in order to hide these transfers from creditors.

iii.    Before the transfers were made, YCA had been sued or threatened with suit by Marc Jacobs and other personal injury plaintiffs. TAS was formed in 2006, shortly after the Jacobs lawsuit was filed in 2005.

iv.     The transfer was of substantially all YCA's assets. In fact, the transfers to TAS from 2006 up until the Petition Date were of 100% of YCA's sole source of revenue.

v.      YCA's assets were concealed by the Officers and Directors. The Officers and Directors negligently, recklessly, and/or intentionally failed to document transfers from YCA to TAS and by their inaccurate, misleading, and ever-changing account balances concealed the true amounts due to YCA, TAS, TMM, Yellow Group, and other affiliated companies.

vi.     The value of the consideration received by YCA from TAS was not reasonably equivalent to the value of the funds transferred to TAS. For example, as noted above, the value of dispatch services has dropped dramatically in recent years, as evidenced by a precipitous drop in call volume to dispatch centers, but TAS did not lower its charges for this service. Indeed, the notion that TAS was "charging" YCA any reasonable value is a farce; TAS simply took 100% of YCA's revenue.

vii.      YCA was insolvent as a result of the transfers to TAS. If TAS had not taken every penny from YCA from 2006 through the Conversion Date, YCA would have had cash reserves to purchase umbrella liability insurance or pay its creditors.

viii.      The transfers of YCA's revenue to TAS occurred shortly after a substantial liability was incurred, specifically the Jacobs lawsuit. The Officers and Directors became aware that, on August 31, 2005, a YCA passenger and customer (Marc Jacobs) suffered a traumatic brain injury while riding in a YCA taxicab due to the negligence of the taxicab driver. Shortly thereafter, in 2006, they formed TAS in an intentional effort to strip YCA of 100% of its revenue, in an effort to evade Mr. Jacobs and other judgment creditors.

260.    These transfers of YCA's revenue to TAS were made without reasonably equivalent value in exchange and were made following the commencement of a lawsuit that ultimately found YCA jointly liable for a $26,000,000 judgment to Jacobses.

261.    At the time of these transfers, YCA either was insolvent or became insolvent.

262.    These transfers left YCA insolvent and essentially judgment proof with remaining assets unreasonably small in relation to YCA's liabilities, including the Jacobs lawsuit and, later, the Jacobs judgment.

263.    The Officers and Directors, TAS, Yellow Group, YMH, CLMH, and TMM, received significant proceeds from the approximately $15 million in yearly revenue YCA was owed under its Affiliation Agreements without providing YCA reasonably equivalent value.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

44

a)     Avoiding the fraudulent transfers pursuant to 740 ILCS 160/5 to the extent permitted by statute;

b)     Awarding damages in the amount of the transfers avoided;

c)     Awarding prejudgment interest;

d)     Awarding all costs and reasonable attorneys' fees associated with this action as may be allowed by law; and

e)     Granting such other relief as this Court deems just and proper.

**COUNT V.**
**PRE-PETITION FRAUDULENT TRANSFERS TO TAS**
**740 ILCS 160/6 — CONSTRUCTIVE INTENT**
**(Against TAS)**

264.    Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

265.    YCA entered into an unfavorable Services Agreement with TAS that allowed TAS to completely control YCA and siphon off all of YCA's revenue.

266.    Defendants, including the Officers and Directors, caused YCA to transfer to TAS approximately $5 million per year since 2006.

267.    The transfers of YCA's revenue to TAS (i.e. from YCA's Members to TAS) were made without reasonably equivalent value in exchange and were made following the commencement of a lawsuit that ultimately found YCA jointly liable for a $26,000,000 judgment to Jacobses.

268.    These transfers left YCA insolvent and with remaining assets unreasonably small in relation to YCA's liabilities, including the Jacobs lawsuit and, later, the Jacobs judgment.

269.    Upon information and belief, the Officers and Directors, TAS, Yellow Group, YMH, CLMH, and TMM, received proceeds from the approximately $15 million in yearly revenue

YCA was owed under its Affiliation Agreements without providing YCA reasonably equivalent value.

270.     As a direct and proximate result of Defendants' conduct, significant assets were transferred from YCA, which is entitled to recover such assets.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

        a)      Avoiding the fraudulent transfers pursuant to 740 ILCS 160/6 to the extent permitted by statute;

        b)      Awarding damages in the amount of the transfers avoided;

        c)      Awarding prejudgment interest;

        d)      Awarding all costs and reasonable attorneys' fees associated with this action as may be allowed by law; and

        e)      Granting such other relief as this Court deems just and proper.

## COUNT VI.
## PRE-PETITION FRAUDULENT TRANSFERS
## 740 ILCS 160/5 – ACTUAL INTENT
### (Against the Officers and Directors)

271.     Trustee repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

272.     YCA entered into an unfavorable Services Agreement with TAS that allowed TAS to completely control YCA and siphon off all of YCA's revenue.

273.     Since TAS's formation in 2006 until the Conversion Date, Levine and Corrigan received from TAS a large portion of YCA's revenue—millions of dollars per year—in exchange for alleged "management fees" and other alleged services or expenses.

46

274.    Upon information and belief, the other Officers and Directors received similar fees from TAS that were allocated to YCA.

275.    These transfers were made with the actual intent to hinder, delay, or defraud YCA's creditors, including the Jacobses, whose claim became known to TAS, Levine, Sakata, Tessler and Corrigan in 2005.

276.    The transfers were made with actual intent to defraud creditors, as evidenced by the following:

   i.    The transfers of YCA's revenue from TAS to Levine and Corrigan and other Officers and Directors were made to insiders. When the debtor is a corporation, an "insider" includes a "person in control of the debtor" and officers and directors of the debtor. 740 ILCS 160/2(g). Levine was an officer, director, and ultimate owner of YCA until the Conversion Date Corrigan was a director an ultimate owner of YCA until the Conversion Date. Sakata was an officer of YCA and Tessler was a director of YCA.

   ii.   The transfers of YCA's revenue from TAS to the Officers and Directors were concealed. Levine and Corrigan did not disclose these transfers and intentionally concealed them. The transfers to Levine and Corrigan were not disclosed until the Examiner's Report was completed in December 2015.

   iii.  In 2005, before the transfers of YCA's revenue from TAS to the Officers and Directors were made, YCA was sued by the Jacobses and other personal injury plaintiffs.

   iv.   The transfers of YCA's revenue from TAS to Levine and Corrigan for "management fees" were substantial, at least $1.5 million per year. Upon

information and belief, transfers in similar amounts were made to the other Officers and Directors.

v.   YCA's assets were concealed by the Officers and Directors. The Officers and Directors negligently, recklessly, and/or intentionally failed to document transfers of YCA's revenue from TAS to Levine and Corrigan and by their inaccurate, misleading, and ever-changing account balances concealed the true amounts due to YCA, TAS, TMM, Yellow Group, and other affiliated companies.

vi.   The value of the consideration received by YCA from the Officers and Directors was not reasonably equivalent to the value of YCA's funds transferred by TAS to the Officers and Directors.

vii.   YCA was insolvent as a result of the transfers of YCA's revenue made by TAS to the Officers and Directors. If TAS had not taken every penny from YCA from 2006 through the Conversion Date, YCA would have had cash reserves to purchase umbrella liability insurance or pay its creditors. If YCA had the millions of dollars transferred to Levine and Corrigan for "management fees" it, likewise, could have purchased liability insurance and made capital investments.

viii.   The transfers of YCA's revenue from TAS to the Officers and Directors occurred shortly after a substantial liability was incurred, specifically the Jacobs lawsuit. The Officers and Directors became aware that, on August 31, 2005, a YCA passenger and customer (Marc Jacobs) suffered a traumatic brain injury while riding in a YCA taxicab due to the negligence of the taxicab driver. Shortly thereafter, in 2006, they formed TAS in an intentional effort to strip YCA of 100% of its revenue, in an effort to evade Mr. Jacobs and other judgment

48

creditors. Millions of dollars per year of YCA's revenue was then transferred by TAS to Levine and Corrigan.

277. These transfers of YCA's revenue from TAS to the Officers and Directors were made without reasonably equivalent value in exchange and YCA was insolvent at that time of the transfers.

278. As a direct and proximate result of Defendants' conduct, significant assets were transferred from YCA, which is entitled to recover such assets.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

    a)    Avoiding the fraudulent transfers pursuant to 740 ILCS 160/5 to the extent permitted by statute;

    b)    Awarding damages in the amount of the transfers avoided;

    c)    Awarding prejudgment interest;

    d)    Awarding all costs and reasonable attorneys' fees associated with this action as may be allowed by law; and

    e)    Granting such other relief as this Court deems just and proper.

### COUNT VII.
### PRE-PETITION FRAUDULENT TRANSFERS
### 740 ILCS 160/6 – CONSTRUCTIVE INTENT
### (Against the Officers and Directors)

279. Trustee repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

280. YCA entered into an unfavorable Services Agreement with TAS that allowed TAS to completely control YCA and siphon off all of YCA's revenue.

49

281.    Since TAS's formation in 2006 until the Conversion Date, Levine and Corrigan received from YCA and/or TAS a large portion of YCA's revenue—at least $1.5 million per year—in exchange for alleged "management fees" and other alleged services or expenses.

282.    Upon information and belief, the other Officers and Directors received similar fees from TAS that were allocated to YCA.

283.    These transfers of YCA's revenue by TAS to the Officers and Directors were made without reasonably equivalent value in exchange and YCA was insolvent at the time the transfers were made.

284.    These transfers of YCA's revenue by TAS to the Officers and Directors were made to insiders for an antecedent debt, the debtor was insolvent at that time, and the insiders had reasonable cause to believe that the debtor was insolvent.

285.    As a direct and proximate result of Defendants' conduct, significant assets were transferred from YCA, which is entitled to recover such assets.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

      a)    Avoiding the fraudulent transfers pursuant to 740 ILCS 160/6 to the extent permitted by statute;

      b)    Awarding damages in the amount of the transfers avoided;

      c)    Awarding prejudgment interest;

      d)    Awarding all costs and reasonable attorneys' fees associated with this action as may be allowed by law; and

      e)    Granting such other relief as this Court deems just and proper.

## COUNT VIII.
## PRE-PETITION FRAUDULENT TRANSFERS TO TMM AND OTHER AFFILIATES
## 740 ILCS 160/5 – ACTUAL INTENT
## (Against TMM, YMH, CLMH, Yellow Group, People Mover, and Yellow Cab Partners)

286.    Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

287.    TMM collected an alleged "referral fee" from YCA without providing services to YCA reasonably equivalent in value to that fee.

288.    The "referral fee" TMM charged YCA was approximately $1 million per year and was charged since 2006.

289.    TMM did not provide services to YCA in exchange for the "referral fee". The alleged "agreement" between YCA and TMM was oral and was not disclosed in the bankruptcy case.

290.    Even if some kind of service was provided to YCA by TMM, the approximately $20,000 weekly charge appears to have been based on **1,600** affiliation Members ($3 * 1,600 members * 4 weeks = $19,200).

291.    Only 679 medallions had any relationship with TMM. Thus, TMM appears to have charged YCA a "referral fee" for 921 cabs (1,600 – 679 = 921) with which it had absolutely no relationship.

292.    Upon information and belief, other affiliated companies owned and/or controlled by Levine and Corrigan and affiliated with YCA, including YMH, CLMH, Yellow Group, People Mover, and Yellow Cab Partners, also received portions of YCA's revenue from TAS in a similar fashion, without providing any service or value to YCA.

293.    These transfers were made with the actual intent to hinder, delay, or defraud YCA's creditors, including the Jacobses, whose claim became known to TMM in 2005, as evidenced by the following:

    i.    The transfers of YCA's revenue by TAS to TMM and other affiliated companies were made to an insider. The transfers of YCA's funds were made initially to TAS, and then to TMM and other affiliated companies controlled by Levine and Corrigan. When the debtor is a corporation, an "insider" includes a "person in control of the debtor." 740 ILCS 160/2(g). TAS, Levine, Corrigan, Sakata, Moberg, and Tessler controlled YCA until the Conversion Date, as evidenced by the conclusions of the Examiner.

    ii.    The transfers were concealed. TMM and other affiliated companies did not disclose these transfers. TMM did not provide written statements regarding services provided to YCA or otherwise document the transfers by TAS of YCA's revenue to TMM.

    iii.    Before the transfers of YCA's revenue from TAS to TMM and/or other affiliated companies were made, YCA had been sued or threatened with suit by Marc Jacobs and other personal injury plaintiffs.

    iv.    The transfers of YCA's revenue from TAS to TMM and/or other affiliated companies were of substantially all YCA's assets. TAS took 100% of YCA's revenue and then transferred substantial portions of YCA's revenue to TMM and other insiders from 2006 (when TMM was formed) until at least the Petition Date.

    v.    YCA's assets were concealed by TMM and the Officers and Directors, who either negligently, recklessly, or intentionally failed to document and account for the

52

transfers of YCA's revenue from TAS to TMM and other insiders. YCA, TAS, TMM, and the Officers and Directors maintained inaccurate and misleading accounting records, used deficient accounting methodologies, and failed to properly account for intercompany balances among YCA, TAS, TMM, Yellow Group and other affiliated companies.

vi.     The value of the consideration received by YCA from TMM and other affiliated companies was not reasonably equivalent to the value of the funds transferred to TMM. For example, as noted above, the value of management services is, at best, related to 679 medallions, but TMM appears to have charged YCA a "referral fee" for approximately 1,600 cabs, 921 of which TMM had absolutely no relationship

vii.    YCA was insolvent as a result of the transfers of YCA's revenue from TAS to TMM and other affiliated companies. If TAS and TMM had not taken every penny from YCA from 2006 through the Conversion Date, YCA would have had cash reserves to purchase umbrella liability insurance or pay its creditors.

viii.   The of YCA's revenue from TAS to TMM and other affiliated companies occurred shortly after a substantial liability was incurred, specifically the Jacobs lawsuit. The Officers and Directors became aware that, on August 31, 2005, a YCA passenger and customer (Marc Jacobs) suffered a traumatic brain injury while riding in a YCA taxicab due to the negligence of the taxicab driver. Shortly thereafter, in 2006, they formed TAS and TMM in an intentional effort to siphon out 100% of YCA's cash, in an effort to evade Mr. Jacobs and other judgment creditors.

294.    These transfers of YCA's revenue from TAS to TMM and other affiliated companies were made without reasonably equivalent value in exchange.

295.    The transfers of YCA's revenue from TAS to TMM and other affiliated companies were made following the commencement of a lawsuit that ultimately found YCA jointly liable for a $26,000,000 judgment to Jacobses. These transfer left YCA essentially judgment proof with remaining assets that were unreasonably small in relation to the judgment owed to the Jacobses.

296.    Upon information and belief, the Officers and Directors, TMM, YMH, CLMH, Yellow Group, People Mover, and Yellow Cab Partners, received proceeds from the approximately $15 million in yearly revenue YCA was owed under its Affiliation Agreements without providing YCA reasonably equivalent value.

297.    As a direct and proximate result of Defendants' conduct, significant assets were transferred from YCA, which is entitled to recover such assets.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

a)      Avoiding the fraudulent transfers pursuant to 740 ILCS 160/5 to the extent permitted by statute;

b)      Awarding damages in the amount of the transfers avoided;

c)      Awarding prejudgment interest;

d)      Awarding all costs and reasonable attorneys' fees associated with this action as may be allowed by law; and

e)      Granting such other relief as this Court deems just and proper.

## COUNT IX.
## PRE-PETITION FRAUDULENT TRANSFERS
## 740 ILCS 160/6 – CONSTRUCTIVE FRAUD
### (Against TMM, YMH, CLMH, Yellow Group, People Mover, and Yellow Cab Partners)

298.    Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

299.    TMM has been collected an alleged "referral fee" from YCA without providing services reasonably equivalent in value to that fee.

300.    The "referral fee" TMM charged YCA was at least $600,000 per year and was charged since 2006.

301.    Upon information and belief, since 2006 YMH, CLMH, Yellow Group, People Mover, and Yellow Cab Partners also received portions of YCA's revenue without providing YCA reasonably equivalent value in exchange.

302.    As a direct and proximate result of Defendants' conduct, significant assets were transferred from YCA, which is entitled to recover such assets.

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

a)      Avoiding the fraudulent transfers pursuant to 740 ILCS 160/6 to the extent permitted by statute;

b)      Awarding damages in the amount of the transfers avoided;

c)      Awarding prejudgment interest;

d)      Awarding all costs and reasonable attorneys' fees associated with this action as may be allowed by law; and

e)      Granting such other relief as this Court deems just and proper.

## COUNT X.
## RECOVERY OF AVOIDED TRANSFERS – 11 U.S.C. § 550
### (Against all Defendants)

303.    Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

304.    The transfers alleged above (the "Transfers") did not serve any legitimate business purpose, and enriched the Defendants at the expense of YCA and its creditors.

305.    YCA did not receive reasonably equivalent value in exchange for the Transfers.

306.    The Transfers are fraudulent transfers avoidable pursuant to 11 U.S.C. § 544, as well as 740 ILCS 160/5 and 160/6.

307.    Defendants were the initial transferee of each of the fraudulent transfers or the immediate or mediate transferee of the initial transferee of the fraudulent transfers.

308.    Pursuant to 11 U.S.C. § 550(a), YCA is entitled to recover from the defendants the value of the fraudulent transfers avoided alleged in the fraudulent transfer counts in this complaint.

        WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

        a)      Awarding Trustee all damages in the amount of the value of the transfers avoided, and

        b)      Granting such other relief as this Court deems just and proper.

## COUNT XI.
## CONVERSION OF YCA'S REVENUE
### (Against all Defendants)

309.    YCA has a right to dues paid by its Members under the Affiliation Agreements.

310.    YCA never received any of the money it was entitled to under the Affiliation Agreements.

311.     Without permission and in violation of the Services Agreement, TAS has taken all of YCA's revenue since 2006.

312.     Defendants are in possession and control of money that belongs to YCA under the Affiliation Agreements.

313.     Defendants do not have a right to these funds.

314.     YCA has demanded and hereby demands return of this property. Defendants have failed to return this property to YCA.

        WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

        a)        Awarding Trustee all damages arising out of and caused by Defendants' conduct; and

        b)        Granting such other relief as this Court deems just and proper.

## COUNT XII.
## CONVERSION OF YCA'S RECEIVABLES AND EQUIPMENT
### (Against all Defendants)

315.     As of the Petition Date, approximately $2,500,000 in receivables were due to YCA.

316.     The Amended Schedules in the Chapter 11 case dated June 22, 2015 list an amount of $8,876,420.88 due from TMM to YCA for past membership/affiliation dues.

317.     YCA has an immediate right to collect on receivables and to possession of its equipment or the value of that equipment.

318.     Defendants are in control of YCA's cash and equipment without a right to either.

319.     Trustee has demanded return of its property from TAS and those demands hve been rejected.

57

WHEREFORE, the Trustee requests that the Court enter judgment in favor of the Trustee:

a)  Awarding Trustee all damages arising out of and caused by Defendants' conduct; and

b)  Granting such other relief as this Court deems just and proper.

## COUNT XIII.
## UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT (15 U.S.C. §1125(A))
### (Against TAS, New YCA, and Yellow Group, and the Officers and Directors)

320.   Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

321.   YCA's Trade Dress, including the yellow color, is inherently distinctive and/or has acquired strong secondary meaning in the minds of consumers through YCA's operation of distinctive yellow cabs since 1996. YCA was the only taxi affiliation in Chicago to operate yellow-colored taxis from 1996 until 2016.

322.   YCA's Trade Dress is non-functional because it is not essential to the use or purpose of operating a taxicab and does not affect the cost or quality of YCA's taxicab service. This is evidenced by the large number of competing taxi affiliations that operate using different trade dress and color schemes.

323.   As a result of the unauthorized, improper and false designation of origin, description of fact, representation of fact and/or use of the Trade Dress, New YCA has and is likely to cause confusion or mistake or to deceive as to the affiliation, connection or association of New YCA with YCA or as to the origin, sponsorship or approval of New YCA and its goods and services by YCA, in violation of the Lanham Act, 15 U.S.C. §1125(a).

58

324. New YCA has used a scheme nearly identical to YCA's Trade Dress in commerce and in commercial advertising in a manner which falsely designates the origin of New YCA products and/or services, and/or which falsely and/or misleadingly represents a suggestion that New YCA's goods and/or services have characteristics and/or qualities which they do not have.

325. New YCA uses YCA's Trade Dress in commerce when New YCA taxicabs cross state lines, including from the State of Illinois to the State of Indiana, by picking up travelers at airports around Chicago, and by advertising to consumers across state lines.

326. New YCA's acts were undertaken in bad faith and conscious disregard of YCA's rights, in a deliberate attempt to capitalize on the goodwill and reputation of YCA, its taxicab business, and its goods and services. New YCA thereby intended to mislead the public into believing that there is a connection, affiliation, or association between New YCA and its taxicab service, and YCA and its taxicab service.

327. As a direct and proximate result of Defendants' conduct, YCA has sustained significant damage.

328. By reason of New YCA's acts, YCA has suffered and will continue to suffer damage and injury to its business, reputation and goodwill, and will sustain loss of revenues and profits.

329. Unless enjoined by this Court, New YCA will continue to perform the acts complained of and cause YCA damages and injury.

WHEREFORE, Trustee prays for a judgment

A) permanently enjoining and restraining New YCA, TAS, and Yellow Group, their officers, agents, members, employees, representative, assigns and all other acting in concert or participation with any of them from: i) using the Trade Dress or any other colorable imitation of such dress, or any trade dress that is confusingly similar to YCA's

Trade Dress in connection with the advertising, promotion or operation of their taxicab business; and ii) doing any other act likely to induce the belief that New YCA's competition taxi business is any way connected with YCA's business or products, or is sponsored or approved by YCA;

B) directing New YCA, TAS, Yellow Group, and the Officers and Directors to i) account for and pay over to YCA all profits derived by from their acts complained of herein, together with prejudgment interest; ii) pay to YCA all the damages it has suffered as a result of the acts of New YCA, TAS, and Yellow Group complained of herein, together with prejudgment interest; iii) pay an award of punitive damages to YCA; iv) pay YCA's reasonable attorneys' fees and cost in this act; and

C) awarding YCA such further relief as this Court deems just and equitable.

## COUNT XIV.
## UNFAIR COMPETITION UNDER ILLINOIS COMMON LAW
### (Against TAS, New YCA, Yellow Group, and the Officers and Directors)

330.    Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

331.    YCA's Trade Dress, including the yellow color, is inherently distinctive and/or has acquired strong secondary meaning in the minds of consumers through YCA's operation of distinctive yellow cabs since 1996. YCA was the only taxi affiliation in Chicago to operate yellow-colored taxis from 1996 until 2016.

332.    YCA's Trade Dress is non-functional because it is not essential to the use or purpose of operating a taxicab and does not affect the cost or quality of YCA's taxicab service. This is evidenced by the large number of competing taxi affiliations that operate using different trade dress and color schemes.

60

333.     Since its inception in 1996, YCA and its Members have utilized YCA's Trade Dress, i.e. the unregistered distinctive visual arrangement on its taxicabs comprising a distinctive yellow color and a circular design mark (stating "Yellow Cab Affiliation, Inc.") and telephone number "312-Taxi-Cab" on the rear doors.

334.     YCA has continuously used the Trade Dress in conjunction with it taxicab services in Illinois since at least 1996 until its dissolution in late 2016.

335.     YCA was the only taxi affiliation in Chicago that was permitted to utilize the yellow color scheme.

336.     By virtue of YCA's continued use of the Trade Dress, including the yellow color, YCA's Trade Dress has become and is distinctive and well-recognized, possesses a strong secondary meaning and has extremely valuable good will attached.

337.     The circular design mark is owned by YCA's former parent, Yellow Group (Reg. No. 2299408). YCA utilized the design mark in connection with its Trade Dress under a license from Yellow Group.

338.     Yellow Group did not register the yellow color and expressly disclaimed the words "Yellow Cab Affiliation, Inc."

339.     TAS and New YCA operate taxicabs that bear a color scheme, circular design mark and telephone number in a manner nearly identical to YCA's Trade Dress without YCA's permission. New YCA taxicabs are the identical shade of yellow and bear a circular design mark stating "Yellow Cab Affiliation" as well as the telephone number 312-Taxi-Cab.

340.     As a result of its unauthorized use of the infringing Trade Dress in connection with the advertising, promotion and operation of New YCA's taxicab service, New YCA, TAS, and

Yellow Group are likely to cause confusion or to cause mistake or to deceive the public, in violation of the common law of the state of Illinois.

341. New YCA, TAS, and Yellow Group are likely to mislead and to continue to mislead prospective consumers as to an affiliation, connection or association of New YCA or its taxicab service, or as to the origin, sponsorship, or approval by YCA, causing consumers to rely thereon, in violation of the common law of Illinois.

342. The actions of New YCA, TAS, Yellow Group, and the Officers and Directors were undertaken in bad faith and conscious disregard of YCA's protected trade dress rights, in a deliberate attempt to capitalized on the goodwill and reputation of YCA.

343. New YCA, TAS, Yellow Group, and the Officers and Directors thereby intended to mislead the public into believing that there is a connection, affiliation, or association between New YCA or its taxicab service, and YCA.

344. New YCA, Yellow Group, TAS, and the Officers and Directors misappropriated valuable property rights of YCA, are trading on the goodwill symbolized by its Trade Dress, and by reason of the actions of New YCA, TAS, and the Officers and Directors suffered injury to its business.

345. The creation of New YCA, and its subsequent operation using identical colors and nearly identical symbols and visual arrangements to the Trade Dress, have proximately damaged YCA, and prevented it from continuing its operations after the Conversion Date.

WHEREFORE, Trustee prays for a judgment

A) permanently enjoining and restraining New YCA, TAS, and Yellow Group, their officers, agents, members, employees, representative, assigns and all other acting in concert or participation with any of them from: i) using the Trade Dress or any other

colorable imitation of such dress, or any trade dress that is confusingly similar to YCA's Trade Dress in connection with the advertising, promotion or operation of their taxicab business; and ii) doing any other act likely to induce the belief that New YCA's competition taxi business is any way connected with YCA's business or products, or is sponsored or approved by YCA;

B) directing New YCA, TAS, Yellow Group, and the Officers and Directors to i) account for and pay over to YCA all profits derived by from their acts complained of herein, together with prejudgment interest; ii) pay to YCA all the damages it has suffered as a result of the acts of New YCA, TAS, and Yellow Group complained of herein, together with prejudgment interest; iii) pay an award of punitive damages to YCA; iv) pay YCA's reasonable attorneys' fees and cost in this act; and

C) awarding YCA such further relief as this Court deems just and equitable.

## COUNT XV.
## DECEPTIVE TRADE PRACTICES UNDER THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/1, ET SEQ.)
### (Against TAS, New YCA, Yellow Group, and the Officers and Directors)

346. Trustee repeats and realleges each and every allegation set forth above as if fully set forth herein.

347. New YCA, TAS, Yellow Group, and the Officers and Directors, by reason of their acts of false designation of origin, false description and/or representation have committed deceptive trade practices, under the Illinois Deceptive Trade Practices Act, 815 ILCS. § 510/2 by causing confusion or misunderstanding as to the source, sponsorship or approval of New YCA's taxi business.

348. The deceptive trade practices and violations of 815 ILCS §510/2 by New YCA, TAS, Yellow Group, and the Officers and Directors were willful, and have proximately damaged YCA.

WHEREFORE, Trustee prays for a judgment

A) permanently enjoining and restraining New YCA, TAS, and Yellow Group, their officers, agents, members, employees, representative, assigns and all other acting in concert or participation with any of them from: i) using the Trade Dress or any other colorable imitation of such dress, or any trade dress that is confusingly similar to YCA's Trade Dress in connection with the advertising, promotion or operation of their taxicab business; and ii) doing any other act likely to induce the belief that New YCA's competition taxi business is any way connected with YCA's business or products, or is sponsored or approved by YCA;

B) directing New YCA, TAS, Yellow Group, and the Officers and Directors to i) account for and pay over to YCA all profits derived by from their acts complained of herein, together with prejudgment interest; ii) pay to YCA all the damages it has suffered as a result of the acts of New YCA, TAS, and Yellow Group complained of herein, together with prejudgment interest; iii) pay an award of punitive damages to YCA; iv) pay YCA's reasonable attorneys' fees and cost in this act; and

C) awarding YCA such further relief as this Court deems just and equitable.

## COUNT XVI.
### UNFAIR BUSINESS PRACTICES AND UNFAIR COMPETITION UNDER THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, ET SEQ.)
### (Against TAS, New YCA, Yellow Group, and the Officers and Directors)

349.    Trustee repeats and realleges each and every allegation set forth in paragraphs above as if fully set forth herein.

350.    As a result of its unauthorized use of the infringing trade dress in connection with the advertising, promotion and operation of New YCA's competing taxicab service, New YCA, TAS, Yellow Group, and the Officers and Directors are likely to cause confusion or to cause mistake or to deceive the public, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq. (the "Illinois Consumer Fraud Act"). See, 815 ILCS 505/2 (prohibiting unfair methods of competition and unfair or deceptive acts or practices, including but not limited to any deception, fraud, false pretense or misrepresentation).

351.    Additionally, by reason of New YCA, TAS, Yellow Group, and the Officers and Directors' deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act and tortious interference, New YCA, TAS, Yellow Group, and the Officers and Directors have committed unfair competition and unfair business practices under 815 ILCS § 505/2.

352.    The actions of New YCA, TAS, Yellow Group, and the Officers and Directors involve trade practices addressed to the market generally or otherwise implicate consumer protection concerns.

353.    The actions of New YCA, TAS, Yellow Group, and the Officers and Directors were designed to mislead consumers about a competitor, and/or implicate public health, safety or welfare issues.

65

354.    The actions of New YCA, TAS, Yellow Group, and the Officers and Directors were willful and/or undertaken with malice, and have proximately caused damage to YCA, entitling YCA to recover three times the amount of YCA's actual damages, in an amount to be proven at trial, as well as attorneys' fees as provided for under 815 ILCS § 505/10a.

WHEREFORE, Trustee prays for a judgment

A) permanently enjoining and restraining New YCA, TAS, and Yellow Group, their officers, agents, members, employees, representative, assigns and all other acting in concert or participation with any of them from: i) using the Trade Dress or any other colorable imitation of such dress, or any trade dress that is confusingly similar to YCA's Trade Dress in connection with the advertising, promotion or operation of their taxicab business; and ii) doing any other act likely to induce the belief that New YCA's competition taxi business is any way connected with YCA's business or products, or is sponsored or approved by YCA;

B) directing New YCA, TAS, Yellow Group, and the Officers and Directors to i) account for and pay over to YCA all profits derived by from their acts complained of herein, together with prejudgment interest; ii) pay to YCA all the damages it has suffered as a result of the acts of New YCA, TAS, and Yellow Group complained of herein, together with prejudgment interest; iii) pay an award of punitive damages to YCA; iv) pay YCA's reasonable attorneys' fees and cost in this act; and

C) awarding YCA such further relief as this Court deems just and equitable.

## JURY DEMAND

Pursuant to his rights guaranteed by the Seventh Amendment to the United States

Constitution, the Trustee hereby demands a trial by jury with respect to the claims asserted in the

complaint.

Respectfully submitted,

MICHAEL K. DESMOND, not individually,
but as Chapter 7 Trustee for the Bankruptcy
Estate of YELLOW CAB AFFILIATION,
INC.

 /s/ John F. Rhoades
Edward S. Weil
John F. Rhoades
DYKEMA GOSSETT PLLC
10 S. Wacker Drive, Suite 2300
Chicago, IL 60606
T: (312) 876-1700 | F: (312) 876-1155
eweil@dykema.com
jrhoades@dykema.com
*Local Counsel to the Chapter 7 Trustee of*
*Yellow Cab Affiliation, Inc.*

J. Gregory Taylor
(*pro hac vice admission pending*)
DIAMOND McCARTHY LLP
489 Fifth Avenue, 21st Floor
New York, New York 10017
(212) 430-5400—Telephone
(212) 430-5499—Facsimile
gtaylor@diamondmccarthy.com
*Counsel to the Chapter 7 Trustee of Yellow*
*Cab Affiliation, Inc.*